No. 38,343

TELECA HICKS KEMMERLE, *Appellee,* v. AUGUST KEMMERLE, *Appellant.*

(232 P. 2d 220)

Opinion filed June 9, 1951.

*Melvin E. Buck,* of Kansas City, argued the cause and was on the briefs for the appellant.

*Thomas J. Brown, Jr.,* of Leavenworth, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This was a divorce case. The present appeal is from an order of the district court finding defendant guilty of contempt for his failure to pay the balance of alimony, attorneys' fees and costs allowed plaintiff. Counsel for appellant raises two points: *First,* the decree for the payment of these items is not such that a contempt proceeding will lie to enforce payment. *Second,* that the evidence upon the hearing for contempt was insufficient to support the order made from which the appeal is taken.

The pertinent facts may be stated briefly as follows: Plaintiff and defendant were married in 1943. It was the second marriage for each of them. Plaintiff had two children by her first marriage and defendant had one. The ages of these children are not stated, but apparently they were adults at the time the order appealed from was entered. After they were married the parties lived on a farm for about five years, but their relations were not congenial, to the extent that there was a separation. Early in 1948 defendant contracted to sell his farm for $25,000 and give possession March 1st. About February 20th of that year he was conducting a sale of his livestock, farm machinery and other farm property. Plaintiff brought this action on February 20, 1948, and by a procedure, not now complained of, had the proceeds of the sale, amounting to a little over $6,000, impounded in the Easton State Bank to await the further order of the court. The trial was delayed because of the illness of Judge Wendorff, the presiding judge of the district court of Leavenworth county, and the Hon. Lawrence F. Day of Atchison, judge of the district court of the second judicial district of this state, was duly selected as judge pro tem to try the action. Defendant filed an answer and cross petition and set up an alleged antenuptial agreement which he asked to have enforced. On one occasion Judge Wendorff permitted defendant to withdraw $500 or $600 of the funds impounded and on another occasion Judge Day permitted defendant to withdraw $300 additional from the impounded funds. Apparently the case was vigorously contested and there were as many as three hearings for the taking of testimony and the court was requested to make findings of fact and conclusions of law.

On June 9, 1949, the court filed its findings of fact and conclusions of law and rendered its decree. The court set aside the antenuptial agreement for the reason it was not freely, fairly and knowingly entered into; that plaintiff was fraudulently induced to execute it; that it was unreasonable, inequitable, against public policy and was so drawn as to invite and encourage a separation, to defendant's profit. The court found that defendant had been guilty of gross neglect of duty and extreme cruelty and granted a divorce to plaintiff upon those grounds. The court further found that at the time of their separation defendant had as much as $45,000 in cash from the sale of his farm and other property. The court further found that plaintiff was entitled to a "separate division of property and as permanent alimony of and from the defendant the sum and amount of $7,500.00, payable in a gross sum," and that the funds impounded and held by the Easton State Bank should be paid into court to apply upon the payment. The court further decreed that the defendant should pay the costs in the action, including a fee to plaintiff's attorney of $1,000. The remainder of the fund held by the Easton State Bank, in the sum of $5,277.47, was paid into court and by the clerk of the court delivered to plaintiff's attorney. This left a balance due of $2,222.53, plus the attorneys' fee, and costs. Counsel for plaintiff endeavored, without success, to find property belonging to defendant and also to find defendant, and two previous citations for contempt had been issued which the sheriff was unable to serve. Finally a citation for contempt was issued on July 21, 1950, which directed the sheriff to bring defendant before the court on August 3, 1950, to show cause, if any he had, why he should not be punished for contempt.

On August 3, 1950, the parties appeared in court with their respective counsel, being the same as represent them now. The plaintiff and the clerk of the court were called as witnesses for plaintiff. Their testimony disclosed the judgment entered for alimony, attorneys' fees and costs, the amount that had been paid thereon, and the amount still due and unpaid. The trial court thought they should have gone further and showed defendant's ability to pay, and because plaintiff had not done so made an order discharging the defendant. This ruling of the court was erroneous. In 27 C. J. S. 1049 the rule is stated thus:

"A prima facie case is made against the contemnor by producing the order for alimony and proof of his failure to make payment according to its terms, and the burden is then on him to prove any legitimate excuse he may have for nonpayment."

The same rule is stated in 17 Am. Jur. p. 510, and was held in our case of *Ott v. Ott*, 129 Kan. 541, 283 Pac. 918.

Plaintiff filed a motion for rehearing and showed authorities to the court which convinced the court it had erred, and the court granted a new hearing, setting the date for September 25, 1950. Prior to that time defendant's attorney, by leave of court, withdrew from the case. Defendant did not appear in court on September 25 and an order was gotten out for his arrest. On October 17, 1950, he was apprehended and brought into court. He had no attorney. The court painstakingly explained to him the situation and why a rehearing had been granted and that it would be his duty to go forward and show what excuse, if any, he had for not paying the balance in harmony with the order of the trial court. In the colloquy between the court, the attorney for plaintiff and defendant he complained about the court changing his ruling. The court recommended that he have an attorney, and the case was continued until October 23. At that time he appeared without an attorney. In colloquy with the court and counsel for plaintiff he complained bitterly about the judgment rendered on July 6, 1949, and talked about the prenuptial contract which the court on that date set aside. There had been no appeal from that judgment and decree and the court advised him that it could not be gone into then, but had to stand as the judgment and the decree of the court. He complained that he "got a raw, yellow deal to start with," and stated, "I have been getting a raw deal all the way through, and everybody knows it," and asserted that he knew the whole circumstances better than the court did. The court explained the situation in detail and offered to give him time to get a lawyer. He said he didn't want one. The court stated:

"The only question before me is this: Is your failure to pay this balance of the judgment wilful? Are you just wilfully refusing to pay her the amount the Court ordered? Now, the law places the burden of proof on you to show this Court that your failure to pay is not wilful. It is up to you."

After further colloquy defendant stated:

"I am going to stick up for my rights. I never got justice, and I will stay right where I am at. . . . If I had anything, you wouldn't ask me, or you wouldn't have me in this Court; you would go and swipe it; you would grab it. That's what you people would do. You are all money hungry. That's what you are."

The defendant was sworn as a witness in his own behalf. The attorney for plaintiff, after stating to defendant that the burden was

upon him to establish his inability to pay, asked questions to which defendant gave answers as follows:

"Q. If you refuse to tell the Court anything, then you stand in contempt, and that's the end of it. There is no question you are in contempt because the burden is on you.

"A. Why do you suppose I have the burden? I never murdered anybody. Why should I be here in contempt of Court. You fellows had two and a half years to go and get what you want. You don't have to come here and have me up here in Court every few days because somebody is going to pay for all of it some day. You can just mark that on your list.

"Q. What do you mean by that?

"A. Never mind what it means; you just take what it means yourself.

"Q. Are you making threats here in the Court?

"A. I am not threatening you. I am telling you. I am telling you I want you to keep out of my tracks. You are just one of these lawyers that wants to hang around and bother innocent people. . . .

"A. And the one before was just as bad, and a whole lot worse. That may seem a little cruel in criticizing, but that's the truth.

"Q. Mr. Kemmerle, did I request you to pay this balance?

"A. I haven't got it.

"Q. Did I ask you in my office to pay this?

"A. Did you what?

"Q. Did I ask you in my office to pay this money?

"A. Yes.

"Q. When you came in to see me?

"A. Yes, you did, and so what?

"Q. What did you tell me?

"A. I told you that I was through a long time ago.

"Q. You weren't going to pay it?

"A. That I didn't have it, and I told you so.

"Q. You told me you weren't going to pay it?

"A. I might have said both."

Answering questions by the court as to how he was making his living, defendant testified he was not farming, that he was not working. "I have money, and it has been two and a half years; a lot of it goes away. I have been doing a lot of traveling." That he had been from coast to coast, north and south, east and west. Answering further questions by plaintiff's attorney he was asked if he used all the money he had in traveling. He said: "I have a little left. Do you think I want to go begging?" He further testified that he expected to go to work "after you fellows let me alone"; that he had no intention to go to work to pay plaintiff. He further testified he had bought an automobile, but later sold it; that he had bought a house in Leavenworth, but had sold that—"Sold the house

on account of my ex-wife." He testified that he had married again and that he and his wife and daughter were living in the house. He said he had no bank account and that he carried no money with him. He was asked why he did not pay the plaintiff when he had the money, and he answered: "Well, because there wasn't no use of paying it." And at another time he stated: "Well, I didn't see where I should do it, because I never got a fair decision." There was much other evidence of this character, although defendant several times stated, "I can't pay; I haven't got it," or words to that effect. The trial court found defendant was in contempt of court in that he knowingly and willfully refused to pay and had violated the orders made by the court on June 6, 1949. The court further decreed the defendant was guilty of contempt, as charged, and that he was committed to the custody of the sheriff, to be placed in jail for a period of six months, or until he purged himself of contempt by paying the sum of $2,222.53 due plaintiff and the $1,000 attorneys' fees and the court costs.

We turn now to the legal questions argued on behalf of appellant. It is first contended that the decree of the court which allowed plaintiff alimony, payable by defendant in a lump sum, and also requiring defendant to pay plaintiff's attorney's fee and costs, is not such a judgment as may be enforced by contempt proceedings. Counsel points out that no execution had ever been issued for the collection of these items; cites 33 C. J. 1053, which distinguishes between judgments, rules and orders; cites our statute, G. S. 1949, 60-3101, which defines a judgment; cites *Hummer v. Lamphear*, 32 Kan. 439, 4 Pac. 865, where it was held that a domestic money judgment may be sued upon; also, *Stauffer v. Remick*, 37 Kan. 454, 15 Pac. 584, where it was held that a verdict in an action in tort does not become a debt until it is merged into a judgment; and *Cunningham v. Mortgage Co.*, 57 Kan. 678, 47 Pac. 830, in which plaintiff sued to recover a specific sum, already accrued, for attorneys' fees and for an accounting, and an additional sum for commissions, in which defendant answered contending plaintiff was indebted to defendant in a specific sum, and succeeded in getting a motion sustained for an order from the trial court that plaintiff pay the sum alleged to be due defendant and prohibiting plaintiff from proceeding further in the action until the sum was paid. This order was promptly set aside on appeal. We think none of the authorities cited by counsel for appellant is controlling here. The

controlling rule was laid down in the case of *In re Peters*, 124 Kan. 455, 260 Pac. 975, where it was held:

"A court of general jurisdiction has power to enforce the payment of alimony previously decreed to a wife by an attachment for contempt where the husband willfully or contumaciously refuses or seeks to evade payments of alimony theretofore adjudged, and this may be done after the expiration of the term at which a decree for alimony was granted."

In the opinion (pp. 456 and 457) it was said:

"Granting that judgments awarding alimony may in some instances be enforced by execution or other ordinary process, that does not deprive the court rendering the decree of authority to attach a party for contempt for willful disobedience or evasions of the order requiring payments of alimony. It is a recognized method for enforcing the provisions of a decree for alimony and the power to employ it inheres in a court of general jurisdiction since it is essential to a due administration of justice. It is not necessary that there should be a statute specifically providing that this remedy may be employed. The silence of a statute in this respect does not deprive the court of the power. It has been held that a lien or execution is illy adapted to enforcement of such an order, and that an attachment for contempt is always available (citing *Scott v. Scott*, 80 Kan. 489, 103 Pac. 1005; *In re Groves*, 83 Kan. 238, 109 Pac. 1087, and other authorities). . . . Nor can the order to pay alimony be treated as an ordinary judgment for debt. It does not arise upon contract, but is based on the duty of the husband to support the wife, an obligation which he owes not only to his wife, but to the public as well. . . ."

Appellant next argues that the testimony was not sufficient to support the finding of the court that appellant knowingly and willfully refused to pay the sums he was directed to pay by the decree. We have set the evidence out quite fully and it need not be repeated further than to say the testimony disclosed appellant had approximately $45,000 in cash at the time of the separation of the parties. Therefore he had ample money to pay all items required of him by the court. Instead of doing that he did not place the money in the bank, or anywhere that plaintiff or her counsel could locate it, and proceeded to carry out a wish he had long entertained to travel all over the country from coast to coast, east to west and north to south. He bought a residence property in Leavenworth and "Sold the house on account of my ex-wife." The testimony shows that he did have money at the time of the hearing. He thought he "had a raw deal" and that there "was no use" in paying. On this point appellant cites the case of *The State v. Dent*, 29 Kan. 416, where it was held:

"Where an attachment is issued in a proceeding as recited above (for contempt in refusing to obey an order to pay temporary alimony and suit money), the defendant is entitled to be discharged if he shows his disobedience is not

willful, but solely on account of his pecuniary inability or some other misfortune over which he has no control."

Clearly the case is not in point here.

A case much more nearly in point is *Johnson v. Johnson*, 148 Kan. 682, 84 P. 2d 888, where the syllabus reads:

"On the hearing of an accusation for indirect contempt in a divorce action, where the defendant admits he has not paid anything on the alimony or toward the support of the infant child for more than eleven months, during which time he, a healthy young man, was being supplied with food and clothing by his parents, his brothers and sisters, and was out of the state most of that time, it is held: (1) that his testimony that he was unable to get employment or furnish anything for the support of his infant child during those eleven months may not need contradictory evidence in order to be wholly disregarded; (2) his failure to do or say anything during that time to show his inability to comply with the order, and his willingness to do so as soon as possible, is the strongest kind of evidence to establish a willful and contemptuous disobedience of the order; and (3) a commitment to the county jail until he purge himself of such contempt is not an indefinite imprisonment."

The opinion refers to many authorities supporting the holding of the court. The case is cited in the recent case (May, 1950) of *Lusty v. Lusty*, 70 Ida. 382, 219 P. 2d 280, 283, where the trial court had excused defendant for his failure to pay on evidence much like the defendant presented to the trial court in this case. The supreme court reversed on the authority of our Johnson case and other authorities.

In 27 C. J. S., at page 1051, our Johnson case is cited in support of the text, which reads:

". . . The husband's failure to do or say anything during the time he failed to make payments to show his inability to comply with the order and his willingness to do so as soon as possible is the strongest kind of evidence to establish a willful and contemptuous disobedience of the order. Where the circumstances do not indicate a willingness on the part of the husband to comply with the order for alimony, his testimony that he was unable to get employment or furnish anything for the support of his wife and child may not need contradictory evidence in order to be wholly disregarded. . . ."

We find no error in the record. The judgment of the trial court is affirmed.